UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DUSTIN GRAHAM GILBERT,    )
        )
    Plaintiff    )
        )
    v.    )    No. 2:24-cv-00371-JAW
        )
MAINE DEPARTMENT OF    )
HEALTH AND HUMAN SERVICES    )
et al.,    )
        )
    Defendants.    )

**ORDER ON DEFENDANTS' MOTION TO DISMISS**

A disabled individual sued the Maine Department of Health and Human Services, a psychiatrist, and three employees of the department under the Americans with Disabilities Act, 42 U.S.C. § 1983, and the Maine Civil Rights Act alleging that the defendants deprived him of his constitutional right to vote when he was a civil inpatient at a state psychiatric center during the November 2022 election. The three individual defendants moved to dismiss the complaint for failure to allege sufficient personal involvement. Concluding the plaintiff made a sufficient showing of two of the individual defendants' direct and supervisory roles in the alleged deprivation of plaintiff's right to vote, the court denies the defendants' motion to dismiss as to two of the three defendants. The motion is granted as to the third individual defendant.

## I.    BACKGROUND

### A.    Procedural History

On November 3, 2025, Dustin Graham Gilbert filed his fourth amended complaint against the Maine Department of Health and Human Services (DHHS),

Sue Vangeli, Janet M. Cassidy, Michel J. Rondon Vidal, MD, Elizabeth (Betsy) Cossette, Heather LNU (Heather Doe), Jane Doe, and John Doe for alleged violation of his right to vote and for disability discrimination while he was a resident at Riverview Psychiatric Center (Riverview) in Kennebec County, Maine. *Fourth Am. Compl. for Violations of Rights to Vote and Be Free From Disability Discrimination; Demand for Jury Trial* (ECF No. 52) (*Compl.*).

On January 12, 2026, the individual defendants—Janet Cassidy, Susan Vangeli, and Elizabeth Cossette (Defendants, herein)—filed a motion to dismiss. *Defendants' Mot. to Dismiss* (ECF No. 63) (*Defs.' Mot.*). On February 13, 2026, Mr. Gilbert responded. *Pl.'s Obj. to Mot. to Dismiss of Three Defs.* (ECF No. 68) (*Pl.'s Opp'n*). On February 27, 2026, the Defendants replied. *Defs.' Reply Memo. in Support of Mot. to Dismiss* (ECF No. 69) (*Defs.' Reply*).

### B.    Factual Background[1]

#### 1.    The Parties

Mr. Gilbert is a citizen of Maine with a long history of civic engagement who has voted in nearly every presidential and midterm election since he turned eighteen. *Compl.* ¶¶ 10, 25-26. He is a qualified individual with a disability for the purposes of the Americans with Disabilities Act (ADA) because of his diagnoses including Bipolar Disorder, Schizoaffective Disorder, Post-Traumatic Stress Disorder (PTSD),

---

[1]    Consistent with the motion to dismiss standard, the Court relied on the complaint's well-pleaded facts. "[T]he court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)).

traumatic brain injuries, insomnia, and mania. *Id.* ¶ 27. Sue Vangeli was a Riverview employee during October and November of 2022 and served as the facility's voting coordinator for the November 2022 state and federal elections. *Id.* ¶ 14. Janet M. Cassidy was employed as Riverview's Director of Rehabilitation during October and November of 2022. *Id.* ¶ 15. Betsy Cossette worked at Riverview in October and November of 2022. *Id.* ¶ 17.

### 2. Mr. Gilbert Resided at Riverview During the November 2022 Election

Mr. Gilbert was confined as a civil inpatient at Riverview's Lower Kennebec Unit from September 29, 2022 to December 1, 2022, which overlapped with elections for state and federal officers held in the United States on November 8, 2022 (the November 2022 election). *Id.* ¶¶ 28-29. Mr. Gilbert was registered and eligible to vote in the November 2022 election and under Maine law, any eligible voter could cast their vote for the November 2022 election by absentee ballot. *Id.* ¶¶ 30-31 (citing 21-A M.R.S. § 751).

The procedure for requesting an absentee ballot is dictated by 21 M.R.S. § 753-A. *Id.* ¶ 32. Requests may be made in person at the municipal clerk's office; in writing, providing the requisite information or by using an approved ballot application form; by telephone; or online. *Id.* (citing 21 M.R.S. §§ 753-A(1), (3), (4), (6)). When appropriate, a third party may request an absentee ballot for an eligible voter. *Id.* (citing 21 M.R.S. § 753-A(5); 21 M.R.S. § 753-C(5)). For an absentee vote to be counted, either a voter must timely vote in person using an absentee ballot or an absentee ballot must be timely returned to the municipal clerk's office. *Id.* ¶ 33.

(citing 21 M.R.S. § 755). From September 29, 2022 to December 1, 2022, while residing at Riverview, Mr. Gilbert was unable to leave the facility of his own volition and understood that if he tried to leave, he would be stopped from doing so. *Id.* ¶ 34. He had no access to a cellular telephone, a computer, or the Internet. *Id.* ¶¶ 35-36.

### 3. Mr. Gilbert Requests an Absentee Ballot Through Riverview's Established Procedure, Follows Up About the Ballot Multiple Times, Never Receives a Ballot, and is Unable to Vote in The November 2022 Election

In October 2022, Riverview notified its residents that it had developed and implemented a process to get absentee ballots to residents who wished to vote in the upcoming November 2022 election (Riverview's voting process). *Id.* ¶ 37. Riverview posted notices in common spaces and sent letters to patients that said:

> It is that time of year! Tuesday November 8th.
> . . . .
> Please sign your name if you want to vote.
> We have registration forms and request for absentee ballot forms available.
>
> Please indicate your request by
>        Monday October 17th.
> We need to get the information to the town office and processed to get your ballot back to you.
>
> If you have any questions, please ask your staff to contact Sue who oversees this process.

*Id.* ¶¶ 38-39; *id.*, Attach. 1, *Vote Flyer*. During October and November 2022, Sue Vangeli served as Riverview's voting coordinator. *Id.* ¶ 40; *id.*, Attach. 2, *Voting Grievance Correspondence* at 4.

Mr. Gilbert put his name on Riverview's sign-up sheet to receive an absentee ballot, and after he did so, he followed up with Riverview employees and independent

contractors to get the absentee ballot. *Id.* ¶¶ 41-42. Riverview staff initially told him that Sue Vangeli was on vacation, but they assured Mr. Gilbert that he would get an absentee ballot when she returned. *Id.* ¶ 42.

Over the following weeks, as Election Day drew nearer, Mr. Gilbert still had not received an absentee ballot; he continued to tell Riverview employees and contractors on his unit, including a nurse named Heather LNU (Heather Doe) and his doctor, Michel J. Rondon Vidal, MD that he wanted to vote but had not received his ballot despite signing up to get one. *Id.* ¶ 43.

One Riverview employee or contractor told Mr. Gilbert he should use the landline telephone on the unit to request a ballot from the municipal clerk's office, but there was no phone book at the telephone station on the unit and Mr. Gilbert did not know the number for the clerk's office, so he asked a staff member or contractor on duty to help him find the right number to call for an absentee ballot. *Id.* ¶ 44. The Riverview employee or contractor replied that he could not give out telephone numbers as part of his job as a mental health care provider. *Id.*

During the weeks leading up to Election Day, after Mr. Gilbert followed up about his ballot multiple times, Sue Vangeli never contacted him, even though the voting notice posted at Riverview promised that staff would contact Ms. Vangeli if a resident asked them any questions about voting. *Id.* ¶ 45. (citing *Voting Flyer*). Ms. Vangeli's contact information was never provided to Riverview residents, so Mr. Gilbert had no choice but to contact staff and contractors on his unit and request that they, in turn, notify Ms. Vangeli of his missing ballot. *Id.*

5

A few days before the election–on the Thursday, Friday, or Monday before Election Day—Mr. Gilbert overheard a conversation between Dr. Rondon Vidal and a higher-ranking female Riverview employee whose name Mr. Gilbert did not know (Jane Doe) in which Jane Doe said words to the effect that Mr. Gilbert was not mentally capable of voting. *Id.* ¶ 46. Mr. Gilbert also overheard Dr. Rondon express his disagreement with her assessment. *Id.*

Ms. Gilbert never got an absentee ballot, despite signing up to receive his ballot and following up multiple times about getting his ballot. *Id.* ¶ 47. As a result, he was unable to vote in the November 2022 election. *Id.*

After Election Day, Mr. Gilbert spoke with other Riverview residents who did receive their absentee ballots. *Id.* ¶ 48. One resident told Mr. Gilbert that Ms. Vangeli had personally approached him before the November 2022 election to ask if he had plans to vote. *Id.* After Ms. Vangeli approached him, this other resident received his absentee ballot and got to vote. *Id.* Mr. Gilbert could not understand why Riverview did not get him his ballot and why Ms. Vangeli never followed up with him about his request for an absentee ballot or voting plans. *Id.* ¶ 49.

### 4. Mr. Gilbert Submits an Internal Grievance and Riverview Admits to a "Rights Violation"

On November 9, 2022, Mr. Gilbert filed an internal grievance with Riverview to report a violation of his right to vote. *Id.* ¶ 50 (citing *Voting Grievance Correspondence*). On the grievance form, Mr. Gilbert explained that he "signed up to vote" "on the list [Riverview had posted]" but "never got a ballot. Others got a ballot. I did not." *Id.* ¶ 51 (citing *Voting Grievance Correspondence*). Mr. Gilbert also

reported, "I asked about my ballot numerous times," referring to the follow-up inquiries regarding his ballot he made to multiple Riverview employees and contractors after he signed up for a ballot on the posted sign-up sheet but did not receive one. *Id.* ¶ 52 (citing *Voting Grievance Correspondence*).

Janet M. Cassidy, Riverview's Director of Rehabilitation, investigated Mr. Gilbert's grievance and sent him a filled-out Grievance Response Form on November 22, 2022. *Id.* ¶ 53 (citing *Voting Grievance Correspondence*). Ms. Cassidy "determined that a violation of [Mr. Gilbert's] rights has occurred." *Id.* ¶ 54 (citing *Voting Grievance Correspondence*). She concluded, "[y]our rights that were violated are: you were not able to exercise your right to vote in the 2022 election." *Id.* Ms. Cassidy explained that she came to this conclusion after she "met with Sue Vangeli – voting coordinator, Betsy Cossette RNC on your unit and Sandy Morisette, RNV who interviewed you about this grievance. I also got a copy of the letter that was distributed to each of the patients . . .." *Id.* ¶ 55 (citing *Voting Grievance Correspondence*). Ms. Cassidy did not interview Mr. Gilbert personally; rather, Ms. Morisette interviewed Mr. Gilbert regarding his grievance and relayed what she learned to Ms. Cassidy. *Id.* ¶ 56.

Ms. Cassidy also explained how she believed the violation of Mr. Gilbert's right to vote occurred: "unfortunately, Sue [Vangeli, Riverview's Voting Coordinator,] was never given the list with your name on [it.] She was given another list from your unit and it did not have your name. She never received any message from your unit staff regarding your wanting a ballot and even when she went to the unit personally to

7

me[e]t w[ith] others your name was not mentioned[.]"  *Id.* ¶ 57 (citing *Voting Grievance Correspondence*).   Thus, Ms. Cassidy admitted that the Riverview employees and contractors Mr. Gilbert had followed up with regarding his missing ballot did not pass on Mr. Gilbert's questions to Ms. Vangeli, as Riverview's voting notice promised staff would do if residents had questions about their ballots.  *Id.* ¶ 57.

Ms. Cassidy further reported that Betsy Cossette, the nurse manager on the Lower Kennebec Unit, Mr. Gilbert's unit, "stated she saw the list with your name by the door but that was not the one Sue received," thus admitting that Mr. Gilbert did, indeed, sign up on the proper form to receive a ballot.  *Id.* ¶ 58 (citing *Voting Grievance Correspondence*).   According to Ms. Cassidy's investigation, Riverview employees and contractors on Mr. Gilbert's unit both failed to give Ms. Vangeli the signup list for an absentee ballot that Mr. Gilbert had signed and failed to follow up with Ms. Vangeli regarding Mr. Gilbert's ballot after Mr. Gilbert reported to them that he had not received one.  *Id.*  ¶ 59.  Mr. Gilbert does not know the names of the staff members and contractors who made these errors, other than Heather Doe, and so complains against "John Does."  *Id.*

If Mr. Gilbert had received an absentee ballot to vote in the November 2022 election, Mr. Gilbert would have voted for a candidate running for the U.S. House of Representatives, Governor of Maine, Maine State Senate, the Maine House of Representatives, Probate Judge, Sheriff, District Attorney, and County Commissioner.  *Id.* ¶ 60.  Mr. Gilbert did not get to cast his vote in any of these elections, even though he was deeply engaged with politics, had thought carefully

8

about who to vote for, and understood the significant public policy implications of these contests. *Id.* ¶ 61. After repeatedly imploring Riverview for a ballot and following all its instructions to get one but still being denied the right to vote, Mr. Gilbert felt tremendously defeated and experienced humiliation, embarrassment, anger, frustration, and mental anguish. *Id.* ¶ 62.

## II.    THE PARTIES' POSITIONS

### A.    The Defendants' Motion to Dismiss

The Defendants argue that under the law, each of them is entitled to an individualized assessment as to whether Mr. Gilbert has asserted a cognizable claim against them, yet Mr. Gilbert fails to allege sufficient personal involvement in a constitutional violation by the Defendants and so the claims against each of them must be dismissed. *Defs.' Mot.* at 5.

### B.    Mr. Gilbert's Opposition

Mr. Gilbert opposes the motion to dismiss, arguing that he merely needs to plausibly show that the Defendants either personally contributed to the violation of his right or were deliberately indifferent to the conduct of their subordinates, thereby linking them to the constitutional violation as supervisors. *Pl.'s Opp'n* at 1.

### C.    The Defendants' Reply

The Defendants reply that Mr. Gilbert fails to allege that the individual defendants were personally involved in the alleged constitutional violation of Mr. Gilbert's right to vote and that Mr. Gilbert does not even argue that Ms. Cassidy was personally involved. *Defs.' Reply* at 1. Further, the Defendants argue that Mr.

Gilbert advances his new theory of supervisory liability in the opposition and that cannot be allowed because he did not plead the same in his complaint. *Id.* at 1-2.

## III. LEGAL STANDARD

For a complaint to survive a motion to dismiss under Rule 12(b)(6), it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Plausible means "something more than merely possible" or "merely consistent with a defendant's liability." *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (quotation marks and citations omitted) (first quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012), and then quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)). Although this does not require "detailed factual allegations," the facts pleaded must at least "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Thus, a facially plausible complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, dismissal is appropriate if a complaint's well-pleaded facts do not "possess enough heft to 'sho[w] that [the plaintiff] is entitled to relief." *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008) (first alteration in original) (quoting *Twombly*, 550 U.S. at 557).

Assessing a complaint's plausibility is a context-specific task that requires "the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In the First Circuit, district courts apply a "two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must

distinguish 'the [counterclaim's] factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P. R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements").

"Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (*en banc*) (citing *Twombly*, 550 U.S. at 555).

## IV.   DISCUSSION

"The disposition of a 42 U.S.C. § 1983 claim also controls a claim under the Maine Civil Rights Act (MCRA)." *Berube v. Conley* 506 F.3d 79, 85 (1st Cir. 2007) (citation omitted). "To plead a plausible § 1983 claim, the plaintiff must allege that the defendant acted under color of state law and that the defendant's conduct violated a protected right." *Pike v. Budd*, 133 F.4th 74, 83 (1st Cir. 2025) (citing *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 45 (1st Cir. 1999)). The threshold question in a § 1983 suit is whether there has been a violation of a federally secured right.

*Drumgold v. Callahan*, 707 F.3d 28, 49 n.13 (1st Cir. 2013) (citing *Baker v. McCollan*, 443 U.S. 137, 140 (1979)).

### A.    Alleged Constitutional Violation

Beginning with the threshold question, the Court concludes Mr. Gilbert sufficiently alleges that the Defendants violated his constitutional rights by preventing him from voting in the November 2022 election.  The right to vote is fundamental under both federal and state constitutions.  *Wesberry v. Sanders*, 376 U.S 1, 17 (1964); *Crafts v. Quinn*, 482 A.2d 825, 820 (Me. 1984).  Mr. Gilbert alleges that he never got an absentee ballot, despite signing up to receive his ballot and following up multiple times about getting his ballot, thus depriving him of his constitutional right to vote under both the United States and Maine Constitutions. *Compl.* ¶¶ 41-49.  Ms. Cassidy, Riverview's Director of Rehabilitation, investigated Mr. Gilbert's grievance ultimately concluded "that a violation of [Mr. Gilbert's] rights has occurred." *Id.* ¶ 54 (citing *Voting Grievance Correspondence*).  Mr. Gilbert plainly meets the pleading standard on the threshold question.

### B.    Alleged Connection between the Constitutional Violation and State Action

The more contested question here is whether Mr. Gilbert sufficiently alleges that the three individual defendants' actions caused a deprivation of his right to vote. That is, in addition to the deprivation of a right, a plaintiff also must establish "a causal connection between the actor and the deprivation, and state action." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (citing 42 U.S.C. § 1983).  In a § 1983 case, "each Government official . . . is only liable for his or her own

12

misconduct." *Iqbal*, 556 U.S. at 677. "To be liable, a 'defendant must have personally participated in, encouraged, condoned, or acquiesced in rights-violating conduct.'" *Echavarria v. Roach*, 565 F. Supp. 3d 51, 77 (D. Mass. 2021) (quoting *Remus-Milán v. Irizarry-Pagán*, 81 F. Supp. 3d 174, 178 (D.P.R. 2015)).

### 1.   Personal Involvement of Susan Vangeli and Elizabeth Cossette

The Court concludes that the individual claims against Ms. Vangeli and Ms. Cossette survive dismissal. Ms. Vangeli and Ms. Cossette were in positions in which they could and should have acted to preserve Mr. Gilbert's right to vote, and he sufficiently demonstrates that these individuals failed to do so.

The Defendants assert that Ms. Vangeli "had no reason to know that [Mr.] Gilbert signed up for a ballot or wanted to vote, and therefore, would have no reason to know that he should have received an absentee ballot" so, lacking personal involvement, the claims against her should be dismissed. *Defs.' Mot.* at 7. Defendants also argue that Mr. Gilbert's operative complaint alleges only that Ms. Cossette confirmed, during the investigation of Mr. Gilbert's post-election grievance, that at some point she saw his name on a list of those who wanted an absentee ballot, but that is not sufficient to infer that Ms. Cossette had any reason to know that Mr. Gilbert had not received his ballot before she learned that information during her investigation of his internal grievance. *Defs.' Mot.* at 7-8. Defendants likewise argue her lack of personal involvement necessitates dismissal. *Id.*

The Court is unconvinced. As Mr. Gilbert points out, as Riverview's Voting Coordinator, Ms. Vangeli oversaw the process of delivering absentee ballots to

13

residents who requested them, but she did not give Mr. Gilbert a ballot despite his request and repeated follow-up requests for a ballot. *Pl.'s Opp'n* at 2. Further, Mr. Gilbert alleges that Ms. Vangeli had personally approached another Riverview resident before the November 2022 election to ask that other resident about his plans to vote and, afterwards, this other resident secured an absentee ballot and voted. *Compl.* ¶ 49. Ms. Cossette, the Nurse Manager on Mr. Gilbert's unit, saw Mr. Gilbert's name on a list of residents seeking a ballot, yet stated "that was not the [list] Sue [Vangeli] received." *Id.* at ¶ 58 (citing *Voting Grievance Correspondence*). As Mr. Gilbert argues, Ms. Cossette "took no action to ensure he received a timely ballot, such as notifying Defendant Vangeli of the overdue ballot or providing Mr. Gilbert a ballot herself." *Pl.'s Opp'n* at 2. The Court concludes that Mr. Gilbert's complaint contains sufficient allegations for the Court to infer that Ms. Vangeli and Ms. Cossette were personally involved in the deprivation of his right to vote.

### 2.  Supervisory Liability of Susan Vangeli, Elizabeth Cossette, and Janet Cassidy

Mr. Gilbert also argues that Defendants Vangeli, Cossette, and Cassidy are liable as supervisors for their deliberate indifference to the risk that their subordinates would improperly execute Riverview's voting process. *Pl.'s Opp'n* at 14-18. "A supervisory liability claim under section 1983 has two elements: the plaintiff must plausibly allege that 'one of the supervisor's subordinates abridged the plaintiff's constitutional rights' and then forge an affirmative link between the abridgement and some action or inaction on the supervisor's part." *Parker v. Landry*, 935 F.3d 9, 14 (1st Cir. 2019) (quoting *Guadalupe-Báez v. Pesquera*, 819 F.3d 509,

14

514 (1st Cir. 2016)). "[C]ulpable action or inaction" can be "a showing of behavior that constitutes 'supervisory encouragement, condonation or acquiescence[,] or gross negligence . . . amounting to deliberate indifference.'" *Id*. at 14 (second and third alteration in original) (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 47 (1st Cir. 2012)).

"The standard for supervisory liability in a Section 1983 case is well-settled. A supervisor cannot be held liable on a theory of *respondeat superior*, nor is evidence demonstrating possible negligence sufficient." *Santiago v. City of Springfield*, No. 19-11869-MGM, 2024 U.S. Dist. LEXIS 246048, at *43 (D. Mass. Feb. 22, 2024), *report and recommendation adopted*, No. 19-11869-MGM, 2024 U.S. Dist. LEXIS 246047 (D. Mass. Mar. 11, 2024). "At a minimum, the plaintiff must allege facts showing that the supervisor's conduct sank to the level of deliberate indifference." *Parker*, 935 F. 3d at 15 (citing *Guadalupe-Báez*, 819 F.3d at 515). Mr. Gilbert relies on deliberate indifference.

"A showing of deliberate indifference has three components: 'the plaintiff must show (1) that the officials had knowledge of facts, from which (2) the official[s] can draw the inference (3) that a substantial risk of serious harm exists.'" *Id*. (alterations in original) (quoting *Guadalupe-Báez*, 819 F.3d at 515).

After the showing of deliberate indifference, "the plaintiff must also allege facts giving rise to a causal nexus between the supervisor's acts or omissions and the subordinate's misconduct" which is to say that "a supervisor's deliberate indifference

15

must lead in a straight line to the putative constitutional violation." *Id.* (citing *Guadalupe-Báez*, 819 F.3d at 515).

"In addition to deliberate indifference and causation, the plaintiff must allege facts showing that the supervisor was on notice" actual or constructive, "of the subordinate's misconduct." *Id.* (citing *Guadalupe-Báez*, 819 F.3d at 515).

Although the Defendants argue that Mr. Gilbert cannot advance a supervisory liability theory because such an argument did not appear in the complaint, *Defs.' Reply* at 1-2, the Court evaluates the plausibility of the theory based on the alleged facts rather than disposing of the issue for failure to state the precise words "supervisory liability." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (noting the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted").

### a.   Susan Vangeli's Supervisory Liability

As for Ms. Vangeli, Mr. Gilbert has made a plausible showing of deliberate indifference sufficient to withstand the motion to dismiss.  Mr. Gilbert alleges that she was the voting coordinator in charge of Riverview's voting process. *Compl.* ¶¶ 14, 38-40.  Mr. Gilbert argues that as a supervisor, "Defendant Vangeli should have been aware of the foreseeable consequences of Riverside's voting program lacking adequate safeguards to avoid requests for ballots being misplaced or ignored until it was too late to vote by absentee ballot." *Pl.'s Opp'n* at 16.  Mr. Gilbert maintains that "it is plausible that she knew or should have known of the substantial risk that the request

16

of a resident for an absentee ballot could fall through the cracks in the haphazard system being used by Riverside to collect and comply with requests to vote." *Id.*

Mr. Gilbert is correct. "Liability will be found even if the supervisor does not have actual knowledge of the unconstitutional behavior." *Ramirez-Lluveras v. Pagan-Cruz*, 833 F. Supp. 2d 151, 159 (D.P.R. 2011) (citing *Colon-Andino v. Toledo-Davila*, 634 F. Supp. 2d 220, 232 (D.P.R. 2009)). That is, even if Ms. Vangeli was unaware that Mr. Gilbert requested but never received a ballot, Mr. Gilbert plausibly alleges that she knew Riverview's voting process relied on her subordinates to relay messages to her and that the process had some deficiencies because she had to meet with Mr. Gilbert's unit to clarify whether some people wanted to vote. *See e.g., Compl.* ¶ 45 (alleging the voting flyer advertised that staff would contact Ms. Vangeli as overseer of the process) (citing *Voting Flyer*); *id.*¶ 57 (alleging that Ms. Vangeli personally met with others in the Lower Kennebec Unit to clarify whether they wanted to vote) (citing *Voting Grievance Correspondence*). Liability attaches because Mr. Gilbert plausibly alleges that Ms. Vangeli had knowledge of facts from which she could infer that there was a substantial risk that the Riverview voting process would fail to furnish ballots to all the residents who wished to vote in the November 2022 election.

As for causation, Mr. Gilbert alleges that during the weeks leading up to Election Day, after Mr. Gilbert followed up about his ballot multiple times, Ms. Vangeli never contacted him, even though the voting flyer posted at Riverview promised that staff would contact Ms. Vangeli if a resident asked them any questions

17

about voting.  *Id.* ¶ 45.  (citing *Voting Flyer*).  Ms. Vangeli's contact information was never provided to Riverview residents, so Mr. Gilbert had no choice but to contact staff and contractors on his unit and request that they, in turn, notify Ms. Vangeli of his missing ballot.  *Id.*  Mr. Gilbert also alleges that "Ms. Cassidy admitted that the Riverview employees and contractors Mr. Gilbert had followed up with regarding his missing ballot did not pass on Mr. Gilbert's questions to Ms. Vangeli, as Riverview's voting notice promised staff would do if any resident had a question about their ballot."  *Id.* ¶ 57.  On these facts alone, it is plausible that Ms. Vangeli's deliberate indifference led to a breakdown in the process that secured Riverview residents' absentee ballots.

The Court can infer that Ms. Vangeli was on constructive or actual notice that the subordinates' misconduct because Mr. Gilbert alleges that Ms. Vangeli went to Mr. Gilbert's unit to personally meet with others about voting.  *Id.* ¶ 57 (citing *Voting Grievance Correspondence*).  That is, Ms. Vangeli could have been on notice that there was something awry in the Riverview voting process such that she was compelled to go meet in person with several residents to talk about voting.

### b. Elizabeth Cossette's Supervisory Liability

Mr. Gilbert alleges that Ms. Cossette was the Nurse Manager of Riverside's Lower Kennebec Unit, where Mr. Gilbert resided, *id.* ¶ 58, and thus he argues that "she supervised the other nurses on that unit." *Pl.'s Opp'n* at 17.  According to the complaint, Ms. Cossette saw a list of residents who wanted ballots with Mr. Gilbert's name on it but noted that it was not the same list that Ms. Vangeli ultimately

18

received. *Compl.* ¶ 58 (citing *Voting Grievance Correspondence*). From this fact, it is plausible for the Court to infer deliberate indifference, causation, and actual notice. *Parker*, 935 F. 3d at 16 (noting "actual notice" is "the primary means by which a plaintiff can show that officials had knowledge of facts from which they could infer a substantial risk of serious harm"). That is, Ms. Cossette had knowledge of facts from which she could infer that a substantial risk of serious harm exists: she knew that there was a discrepancy in the lists of residents seeking absentee ballots, which could lead to a failure to furnish ballots to some residents.

Defendants argue, however, that Ms. Cossette's title "is not enough to make out a claim or for a court to infer supervisory liability" especially when, as here, Mr. Gilbert has not alleged "supervisory activities, such as training or supervising individuals (and particularly those individuals to whom he claims he complained)." *Defs.' Reply* at 5-6. Although the complaint could benefit from "more particulars about" Ms. Cossette's "role and responsibilities" as nurse manager, "[a] high degree of factual specificity is not required at the pleading stage." *Guadalupe-Báez*, 819 F.3d at 514 (quoting *Rodríguez-Reyes v. Molina-Rodríguez,* 711 F.3d 49, 56 (1st Cir. 2013)).

Additionally, Mr. Gilbert alleges that he "continued to tell Riverview employees and contractors on his unit, including a nurse named Heather LNU (Heather Doe) . . . that he wanted to vote but had not received his ballot despite signing up to get one." *Compl.* ¶ 43. Also, he similarly "followed up with several [other] Riverview employees and independent contractors to get his absentee ballot."

19

*Id.* ¶ 42. These facts are sufficient to allege that nurses Ms. Cossette managed were among those at least partially responsible for denying Mr. Gilbert the right to vote.

### c. Janet Cassidy's Supervisory Liability

The Court concludes that the factual allegations do not make out a plausible showing of deliberate indifference by Ms. Cassidy and, thus, do not carry the plaintiff's supervisory liability claims against her over the plausibility threshold.

Defendants argue that Mr. Gilbert merely alleges that Ms. Cassidy investigated his internal grievance and issued a decision, but that is not sufficient to evince any personal involvement in the alleged constitutional violation and so the claims against her should be dismissed. *Defs.' Mot.* at 7. Mr. Gilbert rejoins that he specifically alleges that Ms. Cassidy made an official determination of a rights violation. *Pl.'s Opp'n* at 19 (citing *Compl.* ¶ 53). Citing to an exhibit attached to the complaint, Mr. Gilbert states that Ms. Cassidy "notified Mr. Gilbert, 'I have included a new process to ensure that this does not happen again'" and she described that process. *Id.* (citing *Voting Grievance Correspondence*). Mr. Gilbert thus concludes that "[t]hese facts support the plausible inference that it was deliberate indifference that explains why Defendant Cassidy did not implement this reliable voting system from the start and before the obviously haphazard proceed led to the highly foreseeable violation of Mr. Gilbert's right to vote." *Id.* at 19-20.

Mr. Gilbert does not allege any facts that suggest Ms. Cassidy had knowledge of facts from which she could infer that a substantial risk of serious harm existed until after Mr. Gilbert initiated his grievance. Unlike Ms. Cossette, whom Mr. Gilbert

alleges saw two different voting lists, Mr. Gilbert does not allege that Ms. Cassidy saw any signs of breakdown in Riverview's voting process before election day. Although Mr. Gilbert alleges that Ms. Cassidy was the Director of Rehabilitation at Riverview, *Compl.* ¶ 15, he does not allege sufficient facts to support an inference that any of her subordinates contributed to denying Mr. Gilbert's right to vote, nor even which employees or independent contractors at Riverview Ms. Cassidy supervised.

On the facts before the Court, there is nothing to support the inference that Ms. Cassidy, specifically, would have known that Riverview's voting process was not working. Unlike Ms. Vangeli, there is no allegation that Ms. Cassidy met with any Riverview residents to clarify whether they wanted to vote. Unlike Ms. Cossette, there is no indication that Ms. Cassidy saw a disparity in the voter lists before the election. For all these reasons, Mr. Gilbert does not allege sufficient facts that Ms. Cassidy's conduct sank to the level of deliberate indifference. The Court thus grants the motion to dismiss insofar as it applies to Ms. Cassidy. It is otherwise denied.

## V.   CONCLUSION

The Court GRANTS in part and DENIES in part the Defendants' Motion to Dismiss (ECF No. 63). The motion is GRANTED as to Defendant Janet Cassidy. The motion is DENIED as to Defendants Susan Vangeli and Elizabeth Cossette. The Court therefore DISMISSES without prejudice Mr. Gilbert's Fourth Amended Complaint for Violations of Rights to Vote and Be Free From Disability Discrimination; Demand for Jury Trial (ECF No. 1) as to Janet Cassidy.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of July, 2026